UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

EDDIE PENA,                    )
                               )
            Plaintiff          )
                               )
      v.                       )    Case No. 2:03 cv 334
                               )
USX CORPORATION                )
                               )
            Defendant          )

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment filed by the defendant, United States Steel Corporation
("US Steel"), on November 30, 2005.  For the following reasons,
this motion is **GRANTED**.

Background

The following facts are stated in the light most favorable
to the plaintiff.[1]  The plaintiff, Eddie Peña, was a millwright
for the defendant, US Steel, from 1999 to February 2005.  (Eddie
Peña Dep. pp. 11, 245)  He is of Mexican origin and describes his
race as Hispanic. (Peña Dep. pp. 17-18)

Peña's initial duties as millwright involved performing
preventative maintenance for the Continuous Annealing Line
("2CA") at the Tin Mill located at US Steel's Gary, Indiana
plant. (Peña Dep. pp. 40-43)  His indirect supervisor was John

---

[1] The court notes that neither the defendant's 48-page statement of
facts, the plaintiff's 81-page "response" to the statement of facts and
statement of genuine issues, nor the plaintiff's deposition itself clearly
sets forth when the alleged incidents of harassment occurred and which
managerial employees (other than certain individuals) had supervisory
responsibility for the plaintiff at the time those incidents occurred.

Shockley, the Maintenance Coordinator for coal reduction mechani-
cal maintenance, who in turn reported to Larry Bashore, the Area
Manager of Tin Maintenance and Shockley's immediate supervisor.
(Peña Dep. Pg. 48) Anthony Branch also indirectly supervised Peña
at some point between 2000 and 2004, when Peña was "put in a
cycle to go to repair turns." (Anthony Branch Dep. pp. 10, 14-15)

In 2003, Peña joined a "bull gang," which was a roving group
of millwrights who performed maintenance at every unit in the Tin
Mill. (Peña Dep. pp. 213-14)  Around November 2003, Dick Jarvis
replaced Shockley as Maintenance Coordinator. (Dick Jarvis Dep.
p. 12; Shockley Aff ¶ 6)  By the time Jarvis was the Maintenance
Coordinator, Bashore had been replaced by Keith Lowery.  (Jarvis
Dep. p. 12)  Jarvis was Maintenance Coordinator until April 2004,
when he was replaced briefly by Dennis Klevickas before Peña's
final supervisor, Dominic Bonta, started in September 2004.
(Jarvis Dep. p. 6; Shockley Aff. ¶¶ 6-8)  Also in 2004, David
Armstrong became the Division Manager, which was a management
position over the Maintenance Coordinator and Area Manager. (Peña
Dep. p. 217)

At some point in 2000, Shockley told Peña, "No siestas here"
when Peña was resting on a break. (Peña Dep. pp. 54, 57)  He also
asked Peña how he liked working with his "compadre" when a
Hispanic millwright was made team leader for Peña's section.
(Shockley Dep. pp. 28-29)  In addition, when Peña asked to
transfer to shift work to get away from what he perceived as
harassment in the section of the mill where he worked, Shockley

2

made Peña sign a form affirming that Peña had requested shift
work. (Shockley Dep. p. 33)  He also placed Peña on a Timken
schedule for six months (May to October), which was the least
favorable work schedule in the mill because it required rotating
days off throughout the week rather than free weekends. (Peña
Dep. pp. 60, 181)

It is undisputed that Shockley required Peña and another
employee, Greg Shriver, to sign the forms showing their request
for shift work because they were both attempting to bump on and
off shift work on a weekly basis. (Shockley Dep. p. 34) It is
also undisputed that by agreement with the union, US Steel has a
six month stay on shift work, which means that employees who
request shift work also commit to work the shift for a minimum of
six months. (Shockley Dep. pp. 33-34)  According to Shockley,
Peña was placed on the Timken schedule because he was the junior-
most qualified millwright at the time. (Shockley Dep. p. 23)
Peña admits that he had different training than the three white
employees he claimed received a more favorable work schedule.
(Peña Dep. pg. 182)  He also admits that Shockley never disci-
plined him. (Peña Dep. p. 74)

With respect to Peña coming off the Timken schedule, mill-
wright Angel Claudio testified that Shockley originally intended
Claudio to replace Peña at some point on the shift, thereby
enabling Peña to come off the shift earlier, but chose to have
Claudio replace a millwright more junior to Peña instead. (Angel
Claudio Dep. p. 22)  Peña filed two grievances related to his

3

shift assignments, both of which were denied. (Shockley Dep. pp. 17-18)

For at least four weeks beginning August 23, 2002, Peña claims he was denied an opportunity for overtime when his name was taken off the overtime equalization list and then later appeared with the wrong telephone number. (Peña Dep. pp. 204, 209; Peña Dep. Exh. 15, p. 2) He did not report this problem to anyone until he included it in his first Charge of Discrimina-tion. (Peña Dep. p. 212) Regardless, by the end of the year, everyone on the list was "equalized" for overtime, including Peña. (Branch Dep. p. 64)

On October 3, 2002, Peña filed his first Charge of Discrimi-nation with the Gary Human Relations Commission. (Peña Dep. Exh. 15) Peña initially testified that prior to filing this charge, he attempted to complain to his union griever, Chris Blasczyk, about Shockley's comments. However, Blasczyk told him that "if I didn't like it, why don't I quit, you know, the fucking midget." He also attempted to speak with Shockley's supervisor, Lowery, but was told by Branch that Lowery did not want to speak with him. (Peña Dep. pp. 58-59) Peña later testified that he could not recall if he ever reported Shockley's comments to anyone. (Peña Dep. pp. 172-73) In any event, despite Peña's association of this grievance with Shockley's comments and actions during Peña's deposition, the only manager-related incident Peña mentioned in the Charge was that a "White manager called me on the radio,

'Eddie Pina Colada,'" referring to shift manager Lloyd Emig. (Peña Dep. Exh.15, p.1)

In addition to "piña colada," Peña also was called "piñata," "jalapeño," "midget," and "chihuahua" by coworkers Blasczyk, Grover Bogash, William Postalman, and Mike Pezel.  This occurred over a six month period from April 2002 through October 2002, when Peña finally reported the conduct to the Gary Human Rela- tions Commission. (Peña Dep. pp. 55, 122, 128-29, 136-37, 142-43, 151, 157; Peña Dep. Exh. 15, p. 2)  Blasczyk would threaten to beat Peña "like a piñata" or say, "You little midget, I'm going to beat you like a piñata." (Peña Dep. pp. 120, 122, 135)  Blas- czyk and Bogash also would call Peña "Eddie piñata" on the radio. (Peña Dep. p. 120, 122)  Peña further claims he was called "chabolla" several times by coworker John Bielec, but he does not know what this term means. (Peña Dep. pp. 82, 94, 169-70) Jarvis put an end to Bielec's use of the word, and Bielec apologized to Peña.  (Peña Dep. p. 170)  Peña does not recall that any manage- ment employee ever called him "piñata," "jalapeño," or "chihua- hua." (Peña Dep. pp. 155-56)  After Peña filed his Charge, Peña says that the name-calling ceased. (Peña Dep. pp. 129, 143, 167)

Peña believes "chihuahua" is discriminatory because chihua- huas are small dogs of Mexican origin, although he also suggested that Bogash referred to himself as "dog" or "top dog" and may have liked Peña and wanted Peña to be a "little dog." (Peña Dep. pp. 134-35). Peña believes "midget" is discriminatory because "Mexicans are normally short." (Peña Dep. p. 138)  Similarly, he

believes "jalapeño," "piña colada," "piñata," and "compadre" to
be discriminatory because all of these terms are of Spanish
origin.  He finds Shockley's use of the term "siesta" discrimina-
tory because it implies a stereotype of a "Mexican with the big
hat and the poncho sleeping." (Peña Dep. pp. 156-57, 171)  Peña
does not recall that he ever reported *any* of this name-calling to
management or any other union/management committee prior to
filing his first Charge of Discrimination. (Peña Dep. pp. 137,
145, 155, 165)

Peña also noticed three signs in the center section of the
mill. Around 2000, Peña saw "Yo quiero Taco Bell" written on a
mirror at the mill's center section. (Peña Dep. p. 114; Claudio
Dep. p. 55)  Then, between April and October 2002, a growth chart
was posted in the break room ridiculing Peña's height.  (Peña
Dep. p. 176)  He believes this chart was discriminatory because,
like the term "midget," the chart implied that Mexicans were
short. (Peña Dep. p. 177)  He does not recall reporting this
chart to management. (Peña Dep. p. 178)  Peña also saw another
sign above a break room door indicating that employees had to be
a certain height to enter. (Peña Dep. p. 114)

During the same 2002 period, Peña was showing Branch a
hydraulic leak when Peña's coworker, Mike Pezel, said to him,
"That's all you're good for, sweeping with a broom."  Pezel also
said, "All you do is suck dick . . . . You're nothing but a
fucking dick." (Peña Dep. pp. 105-06)  According to Branch, Pezel
and Peña screamed at each other during this incident, and Branch

"ripped Mr. Pezel a new rear end" over his comment. (Branch Dep. pp. 56-57)

The same day, Peña and Branch returned to the shop area to find a broom cut in half with a sign saying "Eddie's customized broom." (Peña Dep. p. 108) Branch locked the broom in his office, contacted the union representative, and instantly ordered a meeting of all employees at which Shockley restated company policy on discrimination. (Branch Dep. pp. 49-50) Branch and Shockley separately interviewed Pezel, Bogash, and Blasczyk in an attempt to determine who had cut the broom, but no one admitted to the incident. (Shockley Dep. p. 42) Shockley and Branch did not administer discipline because they could not prove which employee cut the broom. (Shockley Dep. p. 43)

Shockley, who supervised Peña during the April to October 2002 period, did not know Peña had a complaint until the EEOC officer notified him following the October Charge of Discrimination. (Shockley Dep. p. 12)

After Peña filed his first Charge of Discrimination in October 2002, Shockley reprimanded Emig, who admitted to calling Peña "piña colada," and instructed Emig to call Peña only by his name. (Shockley Dep. p. 25) Peña refused to attend a meeting Shockley arranged in which Emig was going to apologize, and Emig later apologized to Peña on his own. (Peña Dep. p. 158 and Exh. 11) Shockley also spoke with Bogash regarding calling Peña "chihuahua." Bogash denied it, but Shockley ordered him to refer to Peña only by his name anyway. (Shockley Dep. pp. 24-25)

7

Still in October 2002, but after Peña filed his first Charge, Peña heard coworker Bill Postalman say, "They ought to shoot all the fucking Mexicans on the side of the road," and coworker Clyde Smith respond, "and their donkey [sic] too." (Peña Dep. Exh 15, p. 4, Peña Dep. pp. 102, 193) He also heard Postalman say, "They ought to send all the fucking blacks back to Africa" and "blacks and Mexicans make Puerto Ricans." (Peña Dep pp. 54-55, 193; Dep. Exh. 15, p. 4)  Peña does not recall reporting the comments to management or any union/management committee prior to filing his second Charge of Discrimination. (Peña Dep. p. 194)

On November 12, 2002, Peña filed a second Charge of Discrimination with the Gary Human Relations Commission, this time alleging retaliation. (Peña Dep. Exh. 15, p. 3) In this Charge, Peña complained about the comments made by Postalman and Smith and said that he told these coworkers that they would have to "answer to the federal court system about your remarks." (Peña Dep. Exh. 15, p. 3) He also stated that Postalman then called Plant Security on Peña for trespassing, and that when security arrived, Peña told them that he had a "case against both of those individuals." (Peña Dep. Exh. 15, p. 3; Peña Dep. pp. 236-37) Peña was not charged with trespassing. (Peña Dep. Exh. 15, p. 4)

When Shockley learned from security what had transpired, he spoke with Smith and Postalman. (Shockley Dep. p. 49) The employees denied making the statements, but Shockley still explained to them the policy on harassment and told them that he would not

8

tolerate it. (Shockley Dep. p. 25)  Shockley also met with Peña, and he told Shockley that he would handle the issue through the EEOC and was not interested in having US Steel do anything for him. (Shockley Dep. p. 26) Peña declined to meet with US Steel's EEO officer. (Shockley Dep. p. 40)

Peña claims that coworker Dennis Burke would grab him and start humping and touching him "like a woman," sing opera to him, and told him, "You're a virgin. You ain't got your cherry popped yet." (Peña Dep. p. 81)  Peña once injured his knee putting Burke in a headlock because Burke was touching him. (Peña Dep. pp. 90, 199)  Peña admits that Burke's actions were not racial harass-ment. (Peña Dep. p. 198)

Burke also told Peña that after he got his money from this lawsuit, he should marry Burke and go to Peña's mother's house to eat menudos, tacos, tostados, and flautas. (Peña Dep. p. 80)  In addition, Peña claims that Burke made racial jokes about Mexicans regularly, but Peña could not recall any of the jokes or whether he ever reported Burke to management. (Peña Dep. p. 202)  The only specific comment of Burke's that Peña could recall is that "Mexicans is good workers." (Peña Dep. p. 203)

Finally, Burke commented during his break time on Martin Luther King Day that Burke was a slave overseer. (Peña Dep. p. 91). When Branch, who is African American, investigated this incident later that day, Burke said it was in reference to a show that they were watching on the Discovery Channel. (Branch Dep. pp. 45-46)  Branch understood that other employees also were

9

involved with the general conversation.  According to him, "It's
their lunch break, they can talk about anything while they're
eating." (Branch Dep. pp. 47-48)

During Jarvis' tenure as Peña's supervisor, one or more of
Peña's coworkers would not let Peña take a scooter for work.
(Peña Dep. pp. 79, 212) When Peña told Jarvis that Blasczyk was
driving the scooter, Jarvis ordered Blasczyk to give the scooter
to the bull gang.  Blasczyk then told Peña, "Fuck you, mother
fucker." (Peña Dep. p. 79)  However, Peña had use of the scooter
following Jarvis' action and was satisfied with Jarvis' handling
of the situation. (Peña Dep. pp. 215-16). Peña never was disci-
plined by Jarvis and did not ever make any complaints about him.
(Peña Dep. p. 93)  Peña also had no complaints about Kevickas.
(Peña Dep. p. 95)

When Bonta was Peña's supervisor, Peña had a run-in with a
coworker, Gregory Boynak, over work duties, when Peña was per-
forming work on his break.  This incident ultimately ended in
Bonta yelling at Peña. (Peña Dep. pp. 98-99, 222)  Peña called
the discrimination hotline at work, which led to a meeting
between EEO Officer Laura Kocel and Boynak, Bonta, Blasczyk, and
Peña. (Laura Kocel Dep. p. 10)  During this meeting, Peña  told
Boynak and Bonta that he did not like being talked to "like
that," Boynak denied everything, and Bonta apologized for yell-
ing.  (Peña Dep. pp. 98-99)

Two weeks later, Bonta suspended Peña, along with several
other employees, for five days after the group failed to lock out

10

equipment. (Peña Dep. pp. 92,104; Kocel Dep. p. 16)  Kocel again met with Peña, Bonta, and other management and union representatives. (Kocel Dep. p. 16)  Following this meeting, the suspension was either affirmed or reduced and then only to stay on Peña's record for six months.  (Kocel Dep. pp. 17, 19-20)  Peña claims this grievance was not resolved. (Peña Dep. p. 223)

Peña did not like how coworkers called millwright Angel Claudio, a fellow hispanic, "Julio."  (Peña Dep. p. 219) At some point, a "Danger, No Julios Allowed" sign was posted in the mill, which Peña took to reference Claudio. (Peña Dep. p. 83)  Peña claims that Claudio asked people not to call him "Julio" but never complained because he was afraid of losing his job. (Peña Dep. pp. 84-87) However, Claudio testified that he never complained about being called "Julio" because it did not bother him. (Claudio Dep. p. 43)  He further testified that he told Peña it did not bother him. (Claudio Dep. p. 47)  Claudio took the "no Julios" sign as "heckling for the fun of it" by a coworker that he got along with "like that." (Claudio Dep. p. 46)

Peña was aware that the collective bargaining agreement ("CBA") between his union and US Steel provided for a Joint Management Civil Rights Committee at the plant. (Peña Dep. p. 127) He also was aware that U.S. Steel had a policy prohibiting discriminatory harassment which directed employees to call a 1-800 hotline to report instances of harassment.  (Peña Dep. pp. 117-18)  He knew that this policy did not include reporting instances of perceived harassment to plant security. (Peña Dep.

p. 118) Nevertheless, Peña called plant security to report
harassment "at least" eight times. (Peña Dep. pp. 52-53) Specifi-
cally in his deposition, he admitted to calling security to
complain (1) about Shockley when Peña was nearly (but not ulti-
mately) punished for another millwright's error, (2) when he
found his jacket in a dumpster, (3) when Bonta and Boynak yelled
at him, (4) when Bielic refused to work with him and had "some-
thing in his hands," (5) when scooters were not fixed, (6) when
he heard Branch say he was a "slave overseer," and (7) possibly
when he was called "piña colada" and "jalapeño." (Peña Dep. pp.
69, 96, 99, 114-15, 119, 155, 161, 234)  He further testified
that at times, he reported the perceived harassment only to
security and not to his supervisors.  (Peña Dep. pp. 117-18)

   In January 2005, coworker Bielic had something in his hand,
and Peña believed Bielic was "going to do something" to Peña.
(Peña Dep. Pg. 91-92).  Peña called security, but there is no
evidence that he reported the incident to a supervisor.  (Peña
Dep. p. 115)

   On February 7, 2005, coworkers Jim Bodane and Todd Shireman
separately approached Shockley and told him that they were afraid
of Peña because Peña "had made statements that the wrath of God
would be deserted upon other people, their concern was that the
wrath of God might be Mr. Peña." (Shockley Dep. pp. 57-58)  When
Armstrong met with Peña to assess the situation, Peña mentioned
Lowery, who had not worked for US Steel in one and one-half
years, complained about the 2002 broom incident, mentioned his

lawsuit against the company, said that the company and the
managers were out to get him, that God would take care of his
problems, and "made absolutely no sense to [Armstrong] at all."
(Armstrong Dep. p. 21; Peña Aff. ¶ 17; Peña Dep. p. 244)  Accord-
ing to Peña, Armstrong talked over him and refused to listen to
him. (Peña Aff. ¶ 16)  However, Peña admits that he raised his
voice during this meeting. (Peña Dep. p. 225)

Based on what Armstrong perceived to be Peña's "erratic
behavior and the lack of logic or sense behind the answers to any
questions," Armstrong banned Peña from working at the Tin Mill
and directed him to get a drug test. (Armstrong Dep. pp. 21-24;
Peña Dep. p. 224)  Peña's drug test was negative, but Armstrong
felt that Peña needed to be approved to work by a mental health
specialist before returning to work. (Peña Dep. p. 39)

Peña met once with a counselor for US Steel's Employee
Assistance Program ("EAP").  However, he did not feel comfortable
because a police officer was present, he saw hidden cameras, and
music was playing about "white people run the world." (Peña Dep.
p. 247) Peña ultimately decided not to participate in the program
because he did not like the counselor's "form of questioning."
(Peña Dep. p. 248)  Peña refused to sign a paper giving consent
for ongoing treatment and counseling, and he declined to partici-
pate further in the EAP. (Peña Dep. p. 250) The EAP counselor
recommended that based on Peña's confusing responses in the EAP
evaluation, Peña should remain locked out until undergoing a
psychiatric evaluation by an outside physician, which Peña had

13

not done at the time of his deposition in July 2005. (Peña Dep.
p. 251; Peña Dep. Exh. 18)  If Peña had been cleared for work
after this evaluation, Armstrong was willing to let him come
back. (Peña Dep. p. 41)

During his deposition on July 13, 2005, Peña admitted that
he falsified his employment application in several respects,
including the omission of a felony conviction. (Peña Dep. pp. 13-
14)  As a result of this admission, Peña was issued a five day
suspension that he did not appeal.  (Kocel Dep. p. 24) After the
suspension, Peña was discharged.  (Kocel Dep. p. 24)

On June 13, 2005, Peña filed an amended complaint against US
Steel, asserting claims for race discrimination and retaliation
under 42 U.S.C. §1981 and national origin discrimination under
Title VII, 42 U.S.C. §2000e *et seq*.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary
judgment is proper only if it is demonstrated that "there is no
genuine issue as to any material fact and the moving party is
entitled to a judgment as a matter of law." *See **Celotex Corp. v.
Catrett***, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548
(1986); ***Lawrence v. Kenosha County***, 391 F.3d 837, 841 (7th Cir.
2004); ***Branham v. Snow***, 392 F.3d 896, 901 (7th Cir. 2004); ***Windle
v. City of Marion**, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003),
*cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133
(2003).  The burden is upon the moving party to establish that no
material facts are in genuine dispute, and any doubt as to the

14

existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*, 391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words,

15

> there are any genuine factual issues that
> properly can be resolved only by a finder of
> fact because they may reasonably be resolved
> in favor of either party.
>
> [T]his standard mirrors the standard for a
> directed verdict under Federal Rule of Civil
> Procedure 50(a), which is that the trial
> judge must direct a verdict if, under the
> governing law, there can be but one reason-
> able conclusion as to the verdict.

*Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also,* ***Reeves v. Sanderson Plumbing Prods., Inc***., 530 U.S.

133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22

(2000) (setting out the standard for a directed verdict); ***Celotex***

***Corp***., 477 U.S. at 322-323, 106 S.Ct. at 2553; ***Branham***, 392 F.3d

at 901; ***Lawrence***, 391 F.3d at 841; ***Hottenroth***, 388 F.3d at 1027

(stating that a genuine issue is one on which "a reasonable fact

finder could find for the nonmoving party"); ***Schuster v. Lucent***

***Technologies, Inc***., 327 F.3d 569, 573 (7th Cir. 2003) (stating

that a genuine issue exists and summary judgment is inappropriate

if there is sufficient evidence for a jury to return a verdict

for the nonmoving party).

     As a preliminary matter, the court notes that the facts of

this case present significant problems for Peña regarding his

failure to report the majority of the harassment he perceived to

US Steel's management prior to filing his Charges of Discrimina-

tion and his failure to include several instances of harassment

he now claims in those Charges. Peña also has testified inconsis-

tently regarding whether and when his supervisors could have

learned of the harassment.  He has said both that by virtue of

16

their presence, his supervisors should have known about the
perceived harassment when it occurred but also that he could not
recall complaining to his supervisors about it. (Peña Dep. pp.
128, 137, 145, 155, 165)  In addition, the parties have not
provided the court with the second page of Peña's first EEOC
affidavit, and so the court cannot determine with certainty which
conduct was included in Peña's initial complaint.  (Peña Dep.
Exh. 15)  Despite these serious inconsistencies, for purposes of
summary judgment, the court will assume that US Steel had notice
of the alleged discrimination when it occurred and that each
instance of perceived harassment was included in Peña's EEOC
affidavits.  Regardless, summary judgement must be granted.

The standard for hostile work environment harassment based
on race under §1981 is the same as that used for harassment based
on national origin under Title VII. *See **Hague v. Thompson Distri-
bution Company**, 436 F.3d 816, 821-22 (7th Cir. 2006); **Walker v.
Mueller Industries, Inc**., 408 F.3d 328, 330 (7th Cir. 2005);
**Williams v. Waste Management of Illinois, Inc**., 361 F.3d 1021,
1028 (7th Cir. 2004). To state a *prima facie* case for hostile
work environment under either statute, the plaintiff must estab-
lish "(1) that he was subjected to unwelcome harassment, (2) the
harassment was based on his race, (3) the harassment was severe
and pervasive enough to alter the conditions of his environment
and create a hostile and abusive working environment, and (4)
there is a basis for employer liability." **Beamon v. Marshall &
Isley Trust Company**, 411 F.3d 854, 863 (7th Cir. 2005). *See also*

*Williams*, 361 F.3d at 1029.  Summary judgment must be granted if the plaintiff fails to establish any of these four elements.

Workplace harassment "need not be *explicitly* racial in order to be probative of a hostile environment." *Beamon*, 411 F.3d at 863 (emphasis in original). However, "the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon*, 411 F.3d at 863-64 (*quoting* *Luckie v. Ameritech Corp*., 389 F.3d 708, 713 (7th Cir. 2004). *See also Shanoff v. Illinois Department of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001)(noting that the plaintiff may point to any "facially discriminatory remarks, as well as any of [the harasser's] remarks and behavior that may reasonably be construed as being motivated by . . . hostility to [the plaintiff's] race or religion") In other words, the conduct at issue must have a racial character or purpose. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999).

Here, the only comments that even remotely could be associated with Peña's race or national origin are the sign saying "Yo Quiero Taco Bell," Shockley's use of the words "siesta" and "compadre," the names "piñata," "jalapeño," "piña colada," and "chihuahua," and the comments by Peña's coworkers in 2002 that "they ought to shoot all the fucking Mexicans on the side of the road" and their donkeys and that Mexicans and blacks make Puerto Ricans. None of these instances, considered separately or together, establishes the clear association with race or national

origin necessary to satisfy the second prong of the hostile work environment *prima facie* case. *See **Beamon**,* 411 F.3d at 863-64; ***Hardin**,* 167 F.3d at 345.

First, the phrase "Yo Quiero Taco Bell" does not reference Peña specifically, is not inherently threatening or discriminatory, and cannot be construed to imply that Peña or other hispanics are inferior to others. *See, e.g., **Cerros v. Steel Technologies, Inc.*** (**Cerros I**), 288 F.3d 1040, 1042 (7th Cir. 2002) (describing graffiti stating "Go Back to Mexico," "Tony Cerros is a Spic," "KKK," and "White Power"); ***Dawson v. Monaco Coach Corp.**,* No. 3:02-CV-830, 2005 WL 3005347, at *2-3 (N.D. Ind. Nov. 9, 2005).  In fact, that phrase was an advertising slogan for a fast food restaurant.

Second, no reasonable person could find racial animus by virtue of Shockley's solitary use of two Spanish words in place of their English counterparts.  The words themselves are not derogatory, and the only reason the plaintiff perceives them to be derogatory is his own belief, wholly unsupported by the remainder of the record, that the supervisor meant to imply that all Mexicans are lazy.

Third, while the names Peña was called all have a Spanish origin, none were racial epithets *per se.*  Moreover, calling someone a name which implies a drink, a breed of dog, or a hot pepper is not inherently discriminatory, particularly when there is no evidence that anyone referred to the plaintiff in additional, more racially derogatory terms. *See, e.g., **Cerros I**,* 288

19

F.3d at 1042 (finding the names "brown boy," "spic," "wetback,"
"Julio," and "Javier," to be "racialized derogatory names");
*Shanoff*, 258 F.3d at 698-704 (noting that "haughty Jew" and
multiple derogatory comments about "white Jewish men" like the
plaintiff were "facially discriminatory remarks").

        Finally, the comments by Peña's coworkers regarding shoot-
ing Mexicans and Mexicans and blacks making Puerto Ricans *do*
display racial animus, but these comments were not directed at
Peña specifically. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th
Cir. 2005)(holding that "second-hand" harassment in the form of
comments made in the plaintiff's presence has a lesser impact
than comments directed at the plaintiff); *Smith v. Northeastern
Illinois University*, 388 F.3d 559, 567 (7th Cir. 2004).  In the
absence of more racially discriminatory conduct, these two
instances of second-hand harassment alone simply do not satisfy
Peña's burden under the second prong of the hostile environment
test.  *See Smith,* 388 F.3d at 567.  *See also Hardin*, 167 F.3d at
345-46.

        In addition, Peña has not established that the complained-of
conduct is subjectively and objectively severe or pervasive. *See
Hrobowski v. Worthington Steel Company*, 358 F.3d 473, 476 (7th
Cir. 2004).  In making this determination under the third prong
of the hostile environment test, the court "must consider the
totality of the circumstances, including the 'frequency of the
discriminatory conduct, its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" *Cerros I*, 288 F.3d at 1046 (*quoting* **Harris v. Forklift Systems, Inc.**, 510 U.S. 17, 23, 114 S.Ct. 367, 367, 126 L.E.2d 295 (1993)).  While the court must look at the totality of circumstances, the complained-of conduct still must be linked to race in some way or "sufficiently intertwined with" facially discriminatory remarks or conduct to show that the harassing conduct was motivated by race. **Shanoff**, 258 F.3d at 705. *See also* **Beamon**, 411 F.3d at 863-64; **Hardin**, 167 F.3d at 345.

As already discussed, none of the vaguely racial comments or the second-hand statements by Peña's coworkers reasonably could be construed as conveying actionable racial harassment under the circumstances of this case. *See* **Hardin**, 167 F.3d at 340.  As such, these interactions certainly do not qualify as objectively "severe." These comments also occurred over an approximately six-month period in 2002 and, by the plaintiff's admission, did not continue once he clearly notified the company of his complaint by filing Charges of Discrimination. Peña's attempts to bootstrap other workplace negativity he experienced onto these racially-tinged moments to meet the "pervasive" element of the *prima facie* case simply does not work.

While the court need not address every single instance of non-facially discriminatory conduct by Peña's coworkers here, it is worth noting that there is absolutely nothing inherently racial about Shockley requiring Peña to sign a form indicating that he requested shift work or requiring Peña to perform that

21

work for six months.  These actions were consistent with a labor
agreement, did not extend Peña's time on shift work beyond the
six month minimum outlined in that agreement, did not single Peña
out, and were within management's discretion to direct the work
force.  Likewise, Peña was equalized for overtime by the end of
the year like his coworkers, regardless of whatever reason his
name or information was inaccurate on the overtime list for four
weeks.

While the evidence indicates that Peña's coworkers were rude
to him, swore at him on occasion, and made fun of his height,
neither Title VII nor §1981 is a general civility code designed
to purge the workplace of all rude, vulgar, or annoying behavior.
*See* ***Oncale v. Sundowner Offshore Services, Inc***., 523 U.S. 75, 80,
118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998); ***Patton v. Indianapo-
lis Public School Board***, 276 F.3d 334, 339 (7th Cir. 2002). In
addition, the court declines to expand the ban on racial discrim-
ination articulated in these statutes to include harassment based
on height for no better reason than the plaintiff's unsupported
conclusion that in his coworkers' eyes, Mexicans were short and
therefore all harassment based on height was racially motivated.

The cases on which Peña relies to argue that all of the
negative interactions he experienced should fall under the aegis
of "discrimination" each had a discriminatory "hook" on which the
court could connect the non-facially discriminatory treatment to
that which was discriminatory.  *See, e.g.,* ***Cerros I***, 288 F.3d at
1046-48; ***Haugerud v. Amery School District***, 259 F.3d 678, 694-96

22

(7th Cir. 2001); **Dawson**, 2005 WL 3005347, at *9-11. For example, the plaintiff in **Cerros I** "was subjected to direct and highly offensive racial epithets by employees and supervisors" in addition to having his tires slashed.  288 F.3d at 1946. Like-wise, the plaintiff's supervisor in **Shanoff** directed comments at the plaintiff that plainly were derogatory of his race and religion. *See* 285 F.3d at 705. As discussed extensively above, no such hook exists here.  Because Peña cannot meet the second or third prong of the *prima facie* case for a hostile work environ-ment, both claims under Title VII and §1981 fail.

Peña next argues that US Steel retaliated against him in violation of §1981 for filing a lawsuit against the company when he was excluded from the Tin Mill on February 7, 2005.[2]  This argument is without merit.

Peña proceeds under the direct evidence method of proving retaliation only.  *See* **Williams**, 361 F.3d at 1031. Under this method, Peña may establish a *prima facie* case of retaliation if he presents "direct evidence of (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." **Williams**, 361 F.3d at 1031. Peña alleges that a causal connection exists

---

[2] The parties dispute whether Peña can maintain a retaliation claim under §1981.  A plaintiff cannot sue for retaliation when the plaintiff was objecting to the treatment of someone of a different race, but he probably can maintain suit if the other person is of the same race as the plaintiff.  *See* **Walker**, 408 F.3d at 331; **Hart v. Transit Management of Racine, Inc**., 426 F.3d 863, 866 (7th Cir. 2005).  Presumably, the relevancy of this distinction goes to Peña's complaints about Claudio being called "Julio."  However, the only action Peña alleges caused US Steel to retaliate against him is his own action in filing suit against the company.  Accordingly, the court will not address Peña's objections to the treatment of Claudio.

between his lawsuit and exclusion from the Tin Mill solely because Armstrong learned of the lawsuit approximately one week before Peña was escorted off the premises. (*See* Pl Brief. Opp. MSJ, p. 18)  However, mere temporal proximity between the protected action and the alleged retaliatory response is not enough to prove a causal link. *See **Culver v. Gorman & Company***, 416 F.3d 540, 546 (7th Cir. 2005).

Even assuming that a causal connection could be inferred, Peña has failed to show that the reason Armstrong chose to exclude him from the facility is pretextual. *See **Culver,*** 416 F.3d at 547; ***Walker***, 408 F.3d at 333. At this stage of the inquiry, "the issue before [the court] is not whether an employer's evaluation of the employee was correct but whether it was honestly believed." ***Culver***, 416 F.3d at 547. While the plaintiff contests that he acted in an erratic manner, he admits that he raised his voice, said that God would take care of his problems, and complained about incidents that had occurred nearly three years in the past. (Peña Dep. pp. 225, 244; Peña Aff. ¶ 16)  Two coworkers, to whom Peña did not attribute the harassing treatment, independently reported to Shockley that they were afraid of Peña that day. (Shockley Dep. pp. 57-58) And finally, the EAP counselor stated that Peña should undergo a psychiatric evaluation due to his behavior during a psychological evaluation. (Peña Dep. Exh. 18) Under these circumstances, no reasonable juror could find that US Steel did not honestly believe Peña needed to be excluded from the Tin Mill for the safety of the

other workers. Consequently,  Peña's retaliation claim also fails as a matter of law.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, United States Steel Corporation, on November 30, 2005 is **GRANTED**.

ENTERED this 9th day of March, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge

25